# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

ALTON JONES,

                                        Plaintiff,

v.

U.S. BORDER PATROL AGENT
HERNANDEZ, et al.,

                                        Defendants.

Case No.:  16-CV-1986 W (WVG)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS OR FOR
SUMMARY JUDGMENT [DOC. 52]**

Pending before the Court is a motion to dismiss or for summary judgment filed by Defendants Gerardo Hernandez, Jodan Johnson, David Faatoalia, Joseph Bowen, and John Kulakowski.  [Doc. 52.]  The Court decides the matters on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d)(1).  For the reasons that follow, the Court decides Defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6) only and **GRANTS IN PART AND DENIES IN PART** the motion.

//

//

//

1

## I.   BACKGROUND

The Second Amended Complaint ("SAC") alleges the following facts.

On August 9, 2017, Plaintiff Alton Jones entered the Border Field State Park and went "for a short run" on the paved road that is directly adjacent to the U.S.-Mexico border fence.  (*SAC* [Doc. 38] ¶¶ 1–26.)  The SAC affirmatively alleges that there were no signs of any kind whatsoever to indicate to Mr. Jones that this road was off-limits to pedestrians.  (*See id.* [Doc. 38] ¶ 26 ("Neither the sand path nor the paved road had any barriers, signs, or other visible indicators that the paved road was restricted to pedestrians.").)

Jones ran up the paved road until he encountered a Border Patrol vehicle driving towards him at a rapid rate of speed.  (*SAC* [Doc. 38] ¶ 27.)  The SAC is silent as to what happened during this initial encounter.  (*See id.*)  At this point, Jones initiated a conversation with his wife over the phone.  (*See id.* ("Mr. Jones noticed a Border Patrol vehicle up ahead moving quickly downhill toward him.  He phoned his wife and told her, referring to Defendant Hernandez, "I think that Border Patrol agent is flying down the hill toward me for some reason.").)  The SAC is silent as to any encounter with this first Border Patrol vehicle.

At this point, the SAC alleges that a second Border Patrol vehicle appeared, pulling up alongside Jones.  (*SAC* [Doc. 38] ¶ 28.)  Jones allegedly removed "one of his iPhone earphones" to talk to the second Border Patrol agent, Defendant Johnson.  (*See id.*)  By implication, up until this point Jones had kept the earphones in both of his ears in order to maintain the phone conversation.  (*See id.*)  This time, though, Jones spoke to one of the agents, telling him "that he intended only to run up the hill and back down to the beach."  (*Id.*)  Nothing more appears in the SAC as to any interaction with Johnson at this point.

The next sentence of the SAC reads: "[s]ome time thereafter, a Border Patrol agent in another vehicle (upon information and belief, Defendant Gerardo Hernandez) intercepted Mr. Jones, exited his patrol vehicle, and shouted to Mr. Jones to '[t]urn the fuck around.'  Offended, Mr. Jones replied, '[w]hat's your fucking problem?' " (*SAC*

2

[Doc. 38] ¶ 29.)  After this confrontation (during which time Jones was still on the phone, presumably through the earbuds), Jones "immediately" began to run in the other direction, away from the agent.  (*Id.* [Doc. 38] ¶¶ 30, 32.)

By now, Jones noticed still more agents coming towards him—on quad bikes, and in a third vehicle.  (*SAC* [Doc. 38] ¶ 31.)  Yet, despite all of this, he decided to continue running—and to remain on the phone.  (*Id.* [Doc. 38] ¶ 32.)  He allegedly did not stop to speak with the agents.  Nor did he deviate from the paved road, back onto the trail.  (*See id.* [Doc. 38] ¶¶ 33–34.)  According to the SAC, Jones "fear[ed] that if he ran down from the paved road onto the trail, the agents on the quad bikes would collide with him or use their weapons."  (*Id.* [Doc. 38] ¶ 33.)  Instead, Jones continued running back down the paved road, at which point Defendants Hernandez, Johnson, Faatoalia, and Bowen subdued him.  (*Id.* [Doc. 38] ¶¶ 35–36.)  According to the SAC, "Jones was pummeled to the ground.  One or more of the Individual Defendants hit Mr. Jones on his back and around his neck."  (*Id.* [Doc. 38] ¶ 35.)  "Jones tried to put his hands behind his back and felt someone's knee on his spine."  (*Id.*)  "His arms were twisted up hard behind him, causing him severe pain."  (*Id.*)

The United States has filed a cross-complaint alleging that Agent Johnson was injured during this altercation.  (*Cross-Complaint* [Doc. 19] ¶¶ 1–33.)[1]  The SAC alleges that "[a]t no point did [Jones] resist the agents or react with force of his own" and leaves it ambiguous as to whether any government agents were injured during their encounter with Jones.  (*SAC* [Doc. 38] ¶¶ 36–49.)  It does make the allegations that "Mr. Jones did not assault any Defendant or resist arrest" and that "[t]he accusation that Mr. Jones was responsible for any agent's broken ankle was false."  (*SAC* [Doc. 38] ¶¶ 38, 49.)

According to the SAC, agents arrested Mr. Jones for assaulting a federal agent and left him in a hot car with the heater on for a period of fifteen or twenty minutes.  (*SAC*

---

[1] The Court does not take the facts alleged in the Cross-complaint into account in deciding this motion.

[Doc. 38] ¶¶ 37–47.)  Agent Kulakowski then drove Jones to the Imperial Beach Border Patrol Station via a dirt path.  The car's radio played "very loud rap music" and the agent wore leather gloves, causing Jones to feel "helpless and extremely frightened[,]" worrying that "he was being taken somewhere to be beaten up."  (*See id.* [Doc. 38] ¶¶ 48–52.)  The SAC does not allege that Jones was ever taken anywhere to be beaten.  Rather, it alleges that the route was an "inexplicable and unnecessary driving detour."  (*See id.* [Doc. 38] ¶ 53.)  Kulakowski then searched Jones incident to arrest at the station.  (*Id.* [Doc. 38] ¶ 54.)

Jones was kept until the next morning at the Imperial Beach Border Patrol Station—a total of about seventeen hours.  (*SAC* [Doc. 38] ¶¶ 58–65.)  He asked for an attorney and for medical treatment, but was not provided with either.  (*Id.*)  When he "banged on his cell door at various intervals[,]" agents allegedly "threatened him with 'the chair' "—an ostensible punishment method by which "a detainee is strapped to a chair with a hood or spit bag placed over his head."  (*Id.* [Doc. 38] ¶ 61.)  It is not clear how Jones came to know of this alleged method of punishment, but the SAC does not allege that he was subjected to it.  Explanations for Jones' detention allegedly changed during his overnight period of confinement.  (*Id.* [Doc. 38] ¶ 62.)  According to the SAC, "[t]he lack of clarity or explanation for his arrest and detention caused Mr. Jones extreme anguish."  (*Id.*)  This "extreme anguish was compounded by the acute anxiety Mr. Jones felt at being separated from his wife and young child, and upon overhearing Border Patrol agents . . . laughing at him while he sat in his cell."  (*Id.* [Doc. 38] ¶ 63.)  Jones was released the next morning without charge.

The SAC states eleven causes of action—four against all five individual Defendants: (1) violation of the Fourth Amendment through unconstitutional detention and arrest pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971); (2) violation of the Fourth Amendment through use of excessive force pursuant to <u>Bivens</u>; (3) violation of the Fourth Amendment through

4

unconstitutional search pursuant to <u>Bivens</u>; (4) retaliation in violation of the First Amendment pursuant to <u>Bivens</u>.  (*SAC* [Doc. 38] ¶¶ 85–91.)

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.  <u>See</u> <u>Parks Sch. of Bus., Inc. v. Symington</u>, 51 F.3d 1480, 1484 (9th Cir. 1995).  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1988).  In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party."  <u>Vasquez v. L.A. Cnty.</u>, 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).

Well-pled allegations in the complaint are assumed true, but a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences.  <u>See</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986); <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

5

**B.    Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56**

Summary judgment is appropriate under Rule 56 when the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this "burden of production" in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  See id. at 322–25; Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000) (explaining relevant burden-shifting terminology).  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the Court is not obligated "to scour the record in search of a genuine issue of triable fact . . . ."  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden of production on the motion, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68

F.3d 1216, 1221 (9th Cir. 1995) (citing <u>Anderson</u>, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.").  Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment.  <u>Anderson</u>, 477 U.S. at 255.

### C.    Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Id.</u>  "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.' " <u>City & Cnty. of San Francisco, Calif. v. Sheehan</u>, 135 S.Ct. 1765, 1774 (2015).  "In other words, [qualified] immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " <u>White v. Pauly</u>, 137 S. Ct. 548, 551 (2017) (quoting <u>Mullenix v. Luna</u>, 136 S.Ct. 305, 308 (2015)) (internal quotation omitted).

7

"Qualified immunity is 'an immunity from suit rather than a mere defense to liability.' " Pearson, 555 U.S. at 237 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  As such, " 'it is effectively lost if a case is erroneously permitted to go to trial.' " Id. at 231 (quoting Mitchell, 472 U.S. at 526).  "Indeed, [the Supreme Court has] made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials be resolved prior to discovery.' " Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1983)).  "Accordingly, '[the Supreme Court has] repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' " Id. (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step procedure for analyzing the qualified immunity defense.  First, the court was to decide whether the facts that a plaintiff has alleged made out a violation of a constitutional right, and second if so, the court was to decide whether the right was clearly established at the time.  See Pearson, 555 U.S. at 232 (referencing Saucier, 533 U.S. at 201).  The Supreme Court later rejected rigid, mandatory adherence to this approach in Pearson.  533 U.S. at 237–42.  The Pearson Court emphasized flexibility, especially when qualified immunity is asserted early in litigation—noting that "when qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify," 555 U.S. at 238–39, and that "[t]here are circumstances in which the first step of the Saucier procedure may create a risk of bad decisionmaking." Id. at 239.  In short, sometimes it is better to reach the issue of whether any right that does exist is clearly established before reaching the question of whether the right exists in the first place.  See id.  This is consistent with "the general rule of constitutional avoidance"—avoiding constitutional questions if there is another way of deciding a case.  See id. at 241.  Notably, the Court emphasized that "Saucier's two-step protocol 'disserve[s] the purpose of qualified immunity' when it 'forces the parties to endure additional burdens of suit—such as the costs of litigating constitutional questions and delays attributable to resolving

8

them—when the suit otherwise could be disposed of more readily.' " <u>Id.</u> at 237 (quoting Brief for National Association of Criminal Defense Lawyers as Amicus Curiae 30).

In order to overcome qualified immunity at the pleading stage, a plaintiff must plead facts to overcome both prongs of the immunity: " '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.' " <u>See</u> <u>Wood v. Moss</u>, 134 S. Ct. 2056, 2066–67 (2014) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 735 (2011)). However, in the Ninth Circuit, "[w]hen . . . defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), 'dismissal is not appropriate unless [the Court] can determine, based on the complaint itself, that qualified immunity applies.' " <u>O'Brien v. Welty</u>, 818 F.3d 920, 936 (9th Cir. 2016) (quoting <u>Groten v. California</u>, 251 F.3d 844, 851 (9th Cir. 2001)).

## III. DISCUSSION

### A. Deciding a Motion for Summary Judgment at This Stage Would be Premature.

**If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:**
**(1) defer considering the motion or deny it;**
**(2) allow time to obtain affidavits or declarations or to take discovery; or**
**(3) issue any other appropriate order.**

Fed. R. Civ. P. 56(d). "Where . . . a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any [Rule 56(d)] motion fairly freely." <u>Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation</u>, 323 F.3d 767, 773 (9th Cir. 2003). "Although [Rule 56(d)] facially gives judges the discretion to disallow discovery when the non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.' " <u>Metabolife Int'l</u>,

Inc. v. Wornick, 264 F.3d 832, 846 (9th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986)).

Defendants urge the Court to construe its motion as a motion for summary judgment. (*Defs.' Mot.* [Doc. 52].) They submit several hundred pages of evidence alongside it. [Docs. 52-2–52-10.] Much of the motion's eleven-page statement of facts cites extensively to this evidence in order to contradict factual allegations of the SAC. (*Defs.' Mot.* [Doc. 52] 3–13.)

Plaintiff submits that he has had the opportunity to depose only one witness in this matter—Defendant David Faatoalia. (*See Pl.'s Opp'n* [Doc. 65] 18:20–20:2; *Hayes Decl.* [Doc. 65-2] ¶ 4.) According to the declaration of one C. Hunter Hayes, his counsel, he seeks to depose, *inter alia*, the four other individual defendants, the supervisor who arrived shortly after the altercation took place, and a Rule 30(b)(6) deposition on Defendants' policies on use of force, detention, and video surveillance. (*Hayes Decl.* [Doc. 65-2] ¶ 4.) Furthermore, written discovery is ongoing. (*Id.* [Doc. 65-2] ¶ 3.) In fact, litigation over what written material should be produced has continued throughout in front of Judge Gallo through the pendency of this motion. (*Id.*)

By contrast, Defendants' motion presents excerpts from four depositions. (*Wesley Depo.* [Doc. 52-3]; *Wintz Depo.* [52-4]; *Ana Jones Depo.* [Doc. 52-5]; *Alton Jones Depo.* [Doc. 52-6].) Along with investigative memoranda and declarations, Defendants also submit video and audio evidence to the Court—both of the altercation itself and of Plaintiff's post-arrest interview with government agents. [Docs. 52-9–52-10.] Before considering the full weight of this evidence in the setting of a motion for summary judgment, Plaintiff must have the opportunity to collect his own evidence. See Fed. R. Civ. P. 56(d); Metabolife, 264 F.3d at 846. This is especially evident given the fact that the events underlying this matter allegedly took place at the United States border, or at other facilities within the government's control.

The Court will construe this motion as a motion to dismiss only.  The standard applicable is that mandated by Fed. R. Civ. P. 12(b)(6).  Defendants may refile a motion for summary judgment at a later date.

## B.  Motion to Dismiss Per Fed. R. Civ. P. 12(b)(6)

### 1.  Plaintiff's First Cause of Action—Unconstitutional Detention

Defendants contend that Plaintiff's first cause of action must be dismissed because agents had probable cause to detain Jones, or alternatively that their conduct in detaining and arresting him is protected by qualified immunity.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'  An arrest, of course, qualifies as a 'seizure' of a 'person' under this provision, Dunaway v. New York, 442 U.S. 200, 207–208. . . (1979), and so must be reasonable under the circumstances."  Al-Kidd, 563 U.S. at 735–36.  "Fourth Amendment reasonableness 'is predominantly an objective inquiry.' "  Id. (quoting City of Indianapolis v. Edmond, 531 U.S. 32, 47 (2000)).  "We ask whether 'the circumstances, viewed objectively, justify [the challenged] action.' "  Id. at 736 (quoting Scott v. United States, 436 U.S. 128, 138 (1978)).  "If so, that action was reasonable '*whatever* the subjective intent' motivating the relevant officials."  Id. (quoting Whren v. United States, 517 U.S. 806, 814 (1996)).

Defendants' motion to dismiss the first cause of action is based largely on evidence outside the scope of the SAC.  (*Defs.' Mot.* [Doc. 52-1] 17:13–20 ("Defendants . . . confronted a person who, for some unknown reason, had actively resisted their repeated and escalating efforts to remove him from the surveillance road and had then knocked Agent Johnson to the ground."[2])  This extrinsic evidence is not properly considered in a motion to dismiss.  See Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).

---

[2] These facts appear nowhere in the SAC.

The SAC alleges that agents tackled Plaintiff without warning and without prior (less drastic) attempts to remove him from said road—though it alleges the lack of prior efforts to remove Jones through omission rather than affirmative representation.[3] (*SAC* [Doc. 38] ¶¶ 26–36.) Assuming true the facts alleged in the SAC and making all reasonable inferences in favor of the Defendant, agents arrested Jones after he complied with an order to turn around, and after no agent interacted with him on the road in any meaningful way prior to the events described in paragraph 29. (*See id.*) Making the necessary assumptions at this stage, Defendants tackled and arrested Plaintiff with virtually no precipitating event, and without any warning. Plaintiff has alleged enough facts to overcome individual Defendants' qualified immunity as to this cause of action. See Vasquez, 487 F.3d at 1249; Iqbal, 556 U.S. at 678; al-Kidd, 563 U.S. at 735.

Defendants' motion to dismiss Plaintiffs' first cause of action will be denied.[4]

//

//

//

//

---

[3] As noted, the Court must "accept all material allegations of fact as true and construe the [SAC] in a light most favorable to the non-moving party." Vasquez, 487 F.3d at 1249; Iqbal, 556 U.S. at 678. Plaintiff omits any initial interaction with Agent Hernandez (*SAC* [Doc. 38] ¶ 27), any subsequent meaningful interaction with Agent Johnson when the latter drove up afterwards (*Id.* [Doc. 38] ¶ 28), or anything other than the profanities alleged in paragraph 29 as to the eventual confrontation with Hernandez. (*Id.* [Doc. 38] ¶ 29.) The Court must treat these omissions as tantamount to an affirmative allegation that nothing material to Jones' claims for unlawful arrest or search—or to individual Defendants' immunity—took place during these interactions, other than what is alleged. See Vasquez, 487 F.3d at 1249; Iqbal, 556 U.S. at 678; al-Kidd, 563 U.S. at 735; Fed. R. Civ. P. 8.

[4] Defendants also move to dismiss the first cause of action against Defendant Kulakowski on the ground that he was not present at the time of the arrest. (*Defs.' Mot.* [Doc. 52-1] 19:1–9.) On the contrary, the SAC alleges that "a fifth Border Patrol agent (upon information and belief, Defendant John Kulakowski) took Mr. Jones over to a patrol vehicle and placed him in the back seat." (*SAC* [Doc. 38] ¶ 40.) Jones then remained in the uncomfortably hot car, which allegedly had the heater on (in August), for "fifteen or twenty minutes." (*Id.* [Doc. 38] ¶¶ 2, 47.) The contention that the SAC does not allege Kulakowski's presence is without merit.

## 2. Plaintiff's Second Cause of Action—Excessive Force

Defendants move to dismiss Plaintiff's second cause of action, *inter alia*, for lack of evidence, and "for failure to state a constitutional claim with specificity."[5]  (*Defs.' Mot.* [Doc. 52-1] 22:11–12.)

As a preliminary matter, extrinsic evidence is not properly considered in a motion to dismiss.  See Lee, 250 F.3d at 688.  Defendants' motion to dismiss the second cause of action for lack of evidence will be denied.

Plaintiffs' Bivens claim for excessive force, as stated against all five individual Defendants, reads—in its entirety—as follows:

> **In detaining and arresting Plaintiff, Defendants used excessive and unreasonable force, or failed to prevent the use of excessive and unreasonable force despite reasonable opportunity to do so, in violation of clearly established rights under the Fourth Amendment to the Constitution.**

(*SAC* [Doc. 38] ¶ 87.)  Though this paragraph "incorporates by reference the allegations of paragraphs 1 through 84" of the SAC, the allegations of the preceding paragraphs are wide-ranging.  (*SAC* [Doc. 38] 14:21–22.)  Incorporating 84 paragraphs into a conclusory recitation of elements against five defendants does not suffice to provide each with notice of the allegations supporting the claim against him for the use of excessive force.  See Fed. R. Civ. P. 8; Iqbal, 556 U.S. at 678.

Defendants' motion to dismiss the second cause of action will be granted with leave to amend.


## 3. Plaintiff's Third Cause of Action—Unconstitutional Search

Defendants move to dismiss Plaintiff's third cause of action on two grounds: (1) Defendants Johnson, Hernandez, Faatoalia, and Bowen were not present at the time of the search and had no personal involvement in it; and (2) Defendant Kulakowski was not

---

[5] Defendants do not cite to any authority for the proposition that the applicable pleading standard requires "specificity."  (*Defs.' Mot.* [Doc. 52-1] 22:11–12.)

personally involved in Jones' arrest and had no knowledge as to its lawfulness. (*Defs.' Mot.* [Doc. 52-1] 23:8–25.)

"Consistent with our precedent, our analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." Id. "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." Id.

> **A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.**

United States v. Robinson, 414 U.S. 218, 235 (1973).

First, there is no allegation in the SAC that Defendants Johnson, Hernandez, Faatoalia, or Bowen were involved in any way with the search of Jones incident to his arrest. (*See SAC* [Doc. 38] ¶ 54 ("The fifth Border Patrol agent (upon information and belief, Defendant John Kulakowski) removed Mr. Jones from the car, took him into the station, and searched him incident to arrest, in excess of a limited frisk for weapons, in the absence of any reason to believe Mr. Jones was armed and dangerous.").) Plaintiff does not argue otherwise in his opposition. (*Pl.'s Opp'n* [Doc. 65] 15:1–17.) Without any allegation that these defendants were involved in the search, Plaintiff's claim for unconstitutional search cannot stand against Johnson, Hernandez, Faatoalia, or Bowen.

Second, Defendants contend that Defendant Kulakowski did not arrest Jones and urge the Court to infer that he had no knowledge as to whether the arrest was lawful.

14

(*See Defs.' Mot.* [Doc. 52-1] 23:22–25.)  But the SAC alleges that Kulakowski arrived just after the arrest took place and placed Jones in the patrol car, and it also implies that he then remained on the scene for between fifteen and twenty minutes after that before driving Jones away.  (*See SAC* [Doc. 38] ¶¶ 40–47.)  Kulakowski then allegedly drove Jones to the station, and in the patrol vehicle on the way to the station he made a comment about another agent's broken ankle.  (*Id.* [Doc. 52-1] ¶¶ 48–52.)  Reading the SAC in a light most favorable to Plaintiff, <u>Vasquez</u>, 487 F.3d at 1249, it is reasonable to infer that Kulakowski was aware of the circumstances of the arrest.  <u>See</u> <u>Iqbal</u>, 556 U.S. at 678.

Defendants' motion to dismiss the third cause of action will be granted with leave to amend as to Defendants Johnson, Hernandez, Faatoalia, and Bowen, but denied as to Defendant Kulakowski.

### 4.  Plaintiff's Fourth Cause of Action—First Amendment Retaliation

Defendants move to dismiss Plaintiffs' fourth cause of action, a <u>Bivens</u> claim for retaliation in violation of the First Amendment, because it "is not an appropriate <u>Bivens</u> claim."  (*Defs.' Mot.* [Doc. 52-1] 24:1–13.)

In <u>Bivens</u>, 403 U.S. at 395, the Court found an implied private right of action for a federal agent's violation of the Fourth Amendment.  However, "implied causes of action are disfavored," and "the Court has been reluctant to extend <u>Bivens</u> liability 'to any new context or new category of defendants.' "  <u>Iqbal</u>, 556 U.S. at 675.

In 2017, the Supreme Court decided a landmark case in this area of law, <u>Ziglar v. Abbasi</u>, 137 S. Ct. 1843 (2017).  The <u>Ziglar</u> Court's approach reflected a judicious philosophy as to expanding the <u>Bivens</u> remedy.  <u>Ziglar</u> explicitly distinguished the era in which the <u>Bivens</u> remedy originated from the modern one: "[t]o understand Bivens and the two other cases implying a damages remedy under the Constitution, it is necessary to understand the prevailing law when they were decided."  137 S. Ct. at 1855.  The Court continued:

15

> **In the mid–20th century, the Court followed a different approach to recognizing implied causes of action than it follows now. During this "*ancien regime*," <u>Alexander v. Sandoval</u>, 532 U.S. 275, 287, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Court assumed it to be a proper judicial function to "provide such remedies as are necessary to make effective" a statute's purpose, <u>J.I. Case Co. v. Borak</u>, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Thus, as a routine matter with respect to statutes, the Court would imply causes of action not explicit in the statutory text itself. <u>See, e.g.</u>, <u>id.</u>, at 430–432, 84 S.Ct. 1555; <u>Allen v. State Bd. of Elections</u>, 393 U.S. 544, 557, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); <u>Sullivan v. Little Hunting Park, Inc.</u>, 396 U.S. 229, 239, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) ("The existence of a statutory right implies the existence of all necessary and appropriate remedies").**

<u>Id.</u> (formatting altered from original).

"Later, the arguments for recognizing implied causes of action for damages began to lose their force. In cases decided after <u>Bivens</u>, and after the statutory implied cause-of-action cases that <u>Bivens</u> itself relied upon, the Court adopted a far more cautious course before finding implied causes of action." <u>Ziglar</u>, 137 S. Ct. at 1855. The Court emphasized that "[g]iven the notable change in the Court's approach to recognizing implied causes of action, . . . the Court has made clear that expanding the <u>Bivens</u> remedy is now a 'disfavored' judicial activity." <u>Id.</u> at 1857 (quoting <u>Iqbal</u>, 556 U.S. at 675) (formatting altered from original). "This is in accord with the Court's observation that it has 'consistently refused to extend <u>Bivens</u> to any new context or new category of defendants.' " <u>Id.</u> (quoting <u>Malesko</u>, 534 U.S. at 68 (2001)). "Indeed, the Court has refused to do so for the past 30 years." <u>Id.</u>

"When a party seeks to assert an implied cause of action under the Constitution itself, . . . separation-of-powers principles are or should be central to the analysis." <u>Ziglar</u>, 137 S. Ct. at 1857. "The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" <u>Id.</u> (quoting <u>Bush v. Lucas</u>, 462 U.S. 367, 380 (1983)). "The answer will most often be Congress." <u>Id.</u> "[T]he Court has urged 'caution' before 'extending <u>Bivens</u> remedies into any new context.' " <u>Id.</u> (quoting <u>Malesko</u>, 534 U.S. at 74). "[A] <u>Bivens</u> remedy will not be available if there are " 'special factors counselling hesitation in the absence of affirmative action by Congress.' " <u>Id.</u> (quoting <u>Carlson v. Green</u>, 446 U.S. 14, 18 (1980) (quoting, in turn, <u>Bivens</u>, 403 U.S. at

396)).  Though the Court has not defined the phrase "special factors counseling hesitation"—which comes from the mid-20th century <u>Bivens</u> opinion itself—"[t]he necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  <u>Id.</u> at 1857–58.

A special factors analysis to determine whether to extend the <u>Bivens</u> remedy is necessary if a plaintiff asks for a <u>Bivens</u> remedy in a new context.  <u>See</u> <u>Ziglar</u>, 137 S. Ct. at 1859–60.  "The proper test for determining whether a case presents a new <u>Bivens</u> context is as follows."  <u>Id.</u>  "If the case is different in a meaningful way from previous <u>Bivens</u> cases decided by this Court, then the context is new."  <u>Id.</u>

> **A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous <u>Bivens</u> cases did not consider.**

<u>Id.</u> at 1860.  This is a much more exacting standard than that employed by the Court of Appeal in the <u>Ziglar</u> case—which had first asked if the constitutional right at issue was the same, and then if the answer was yes, proceeded to the second question of whether the mechanism of injury had been present in a previous Bivens decision.  <u>Id.</u> at 1859.

Plaintiff's cause of action for First Amendment retaliation under <u>Bivens</u> is as follows:

//
//
//
//
//
//
//

17

**89.** During his encounter with Defendant Hernandez, Mr. Jones engaged in constitutionally protected speech. Specifically, when Defendant Hernandez shouted to Mr. Jones to "turn the fuck around," Mr. Jones replied[,] "What's your fucking problem?"

**90.** Mr. Jones's constitutionally protected speech was a substantial motivating factor for the Defendants' subsequent assault, battery, arrest, and overnight detention of Mr. Jones. Defendants thus retaliated against Mr. Jones because of his speech.

**91.** Defendants' actions would chill a person of ordinary firmness from engaging in such constitutionally protected speech, in violation of the First Amendment.

(*SAC* [Doc. 38] ¶¶ 89–91.) In opposition to Defendants' motion, Plaintiff points the Court to two Ninth Circuit decisions for the proposition that "[t]he Ninth Circuit has expressly recognized <u>Bivens</u> claims for First Amendment retaliation and this remains the applicable law." (*Pl.'s Opp'n* [Doc. 65] 16:11–20.)

In the first, <u>Gibson v. United States</u>, the Ninth Circuit in 1986 allowed a First Amendment <u>Bivens</u> claim to proceed against several FBI agents for seeking "to penalize and discourage [a plaintiff's] controversial political activities through an unremitting campaign of terror and harassment." 781 F.2d 1334, 1337–43 (9th Cir. 1986). The behavior alleged "included an array of undercover tactics, such as wiretapping her telephone, passing defamatory information to her employers, and seeking to entrap her in contraband drug transactions." <u>Id.</u> at 1341. Reflecting the more permissive approach often embraced by courts of the mid-20th century, <u>Ziglar</u>, 137 S. Ct. at 1855, the court implied the <u>Bivens</u> damages remedy as a routine matter. <u>See id.</u> at 1342 n.3 ("Given the availability of § 1983 relief against state agents who infringe First Amendment rights, . . . it is hard to see why Bivens relief should not be available to redress equivalent violations perpetrated by federal agents.").

//
//
//
//

In the second, <u>Martin v. Naval Criminal Investigative Serv.</u>, 10-CV-1879 WQH (MDD), 2011 WL 13142108 (Hayes, J.), <u>aff'd</u>, 539 F. App'x 830, 832 (9th Cir. 2013),[6] the plaintiff was a federal contract investigator "performing mostly personnel security investigations and . . . military criminal defense investigations[,]" working with NCIS at the direction of defense counsel. 2011 WL 13142108, at *2, 7. Her investigations had undermined prosecution testimony in courts-martial, and she had previously testified that NCIS agents had conducted an interrogation in violation of policy and regulations. <u>Id.</u> The plaintiff in <u>Martin</u> had alleged that Defendant NCIS and its agents harassed her and falsely accused her of impersonating an NCIS agent as a means of retaliating against her for her work in investigating and speaking out against official misconduct. <u>See id.</u> at *1–7. The district court embraced the <u>Bivens</u> remedy for First Amendment retaliation under the authority of <u>Gibson</u>, and the Ninth Circuit affirmed. 539 F. App'x at 832–33.

This situation is meaningfully different from the cases Plaintiff cites, for two reasons. <u>See</u> <u>Ziglar</u>, 137 S. Ct. at 1859–60.

First, both precedent cases involved continuing and elaborate schemes to punish plaintiffs for patterns of speech. <u>See</u> <u>Gibson</u>, 781 F.2d at 1337–43; <u>Martin</u>, 10-CV-1879 WQH (MDD), 2011 WL 13142108, at *2–7, aff'd, 539 F. App'x 830 (9th Cir. 2013). Here, by contrast, a relative stranger allegedly encountered a federal law enforcement agent and had a brief, profanity-laced encounter with him. (*SAC* [Doc. 38] ¶¶ 26, 29.) Plaintiff urges the Court to infer unconstitutional retaliation based on the allegation that Jones asked Agent Hernandez, "What's your fucking problem?" and was thereafter arrested and searched, allegedly through the use of excessive force. (*Id.* [Doc. 38] ¶¶ 29, 89.) Judicially imposing First Amendment liability for arresting or searching a cursing suspect would threaten significant disruption of the proper functioning of the executive

_____

[6] The appellate decision is appropriate for citation per 9th Cir. R. 36-3(b) and Fed. Rule of Appellate Procedure 32.1.

branch.  <u>Ziglar</u>, 137 S. Ct. at 1860.  It would extend the specter of litigation over broad swaths of agents' decision-making in the field, and it would likely increase the costs of enforcing federal law as a general matter.

Second, and critically, this incident took place directly adjacent to the United States border—a place where "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country" has been long-recognized and broadly protected.  <u>See</u> <u>United States v. Ramsey</u>, 431 U.S. 606, 616–19 (1977) (recognizing border searches as " 'reasonable' by the single fact that the person or item in question had entered into our country from outside."); <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 538 (1985) (noting that "cases reflect longstanding concern for the protection of the integrity of the border[,]" a "concern [that] is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics . . . and in particular by the increasing utilization of alimentary canal smuggling."); 19 U.S.C. § 1582 ("[A]ll persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations."); 19 C.F.R. § 162.5–.6 (authorizing searches of vehicles, aircraft, persons, baggage, and merchandize arriving into the United States from outside).  Extending First Amendment <u>Bivens</u> liability to suspects trading profanities with border protection officers at the border could have wide-reaching consequences to agents' future decision-making—in searches as well as arrests.

This is not the same <u>Bivens</u> context as those Plaintiff cites in opposition.  <u>See</u> <u>Ziglar</u>, 137 S. Ct. at 1859–60.  As such, the question now becomes whether there exist " 'special factors counselling hesitation[,]' " <u>id.</u> at 1854 (quoting <u>Bivens</u>, 403 U.S. at 396), 1857—or, in modern parlance—" 'who should decide' whether to provide for a damages remedy, Congress or the courts?"  <u>Id.</u> at 1857 (quoting <u>Bush</u>, 462 U.S. at 380).  "The answer will most often be Congress."  <u>Id.</u>  "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  <u>Id.</u> at 1857–58.

> Sometimes there will be doubt because the case arises in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere. See Chappell, supra, at 302, 103 S.Ct. 2362 (military); Stanley, supra, at 679, 107 S.Ct. 3054 (same); Meyer, supra, at 486, 114 S.Ct. 996 (public purse); Wilkie, supra, at 561–562, 127 S.Ct. 2588 (federal land).

Id. at 1858.

> And sometimes there will be doubt because some other feature of a case—difficult to predict in advance—causes a court to pause before acting without express congressional authorization. In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

Id. To reiterate, the Supreme Court has refused to extend Bivens to any new context in 30 years. Id. at 1857.

Here, Plaintiff urges the Court to extend a Bivens remedy for a violation of the First Amendment through retaliation for an exchange of profanity with a Border Patrol agent, directly adjacent to the border itself. There are at least two reasons why the Judiciary is not "well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed" in this context. See Ziglar, 137 S. Ct. at 1857–58. First, just as the Ziglar Court reiterated as to the military, the public purse, and federal land, Congress has designed its regulatory authority in a guarded way as to border protection. See id. at 1858; see, e.g., 19 U.S.C. §§ 482, 1582; 19 C.F.R. § 162.5–.6. Second, such a remedy could have wide-reaching consequences as to the costs of enforcing the law at the border. (*See Defs.' Reply* [Doc. 68] 9:14–18.) "Allowing a damages suit in this context, or in a like context in other circumstances, would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." Ziglar, 137 S. Ct. at 1861. Because special factors counsel hesitation in this context, the Court will not extend the Bivens remedy to a First Amendment retaliation claim in these circumstances.

21

Defendants' motion to dismiss Plaintiffs' fourth cause of action will be granted without leave to amend.

## IV. CONCLUSION & ORDER

Defendants' motion to dismiss Plaintiffs' first cause of action is **DENIED**.

Defendants' motion to dismiss the second cause of action is **GRANTED**.

Defendants' motion to dismiss the third cause of action is **GRANTED** as to Defendants Johnson, Hernandez, Faatoalia, and Bowen, but **DENIED** as to Defendant Kulakowski.

Defendants' motion to dismiss Plaintiffs' fourth cause of action is **GRANTED** without leave to amend.

Plaintiff will have leave to amend the SAC in accordance with the terms of this order. Any amendment must be filed by **Friday, December 1, 2017**.


**IT IS SO ORDERED.**

Dated: November 9, 2017

_____
Hon. Thomas J. Whelan
United States District Judge

16-CV-1986 W (WVG)